FILED
UNITED STATES DISTRICT COURT
LAS CRUCES, NEW MEXICO
JUL 1 5 2002
CLERK
DEP. CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SANDRA VIGIL o/b/o
JESUS E. DOMINGUEZ,

Plaintiff,

v.  CIV 01-635 BB/KBM

JO ANNE B. BARNHART,[1]
Commissioner of Social Security,

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on the Motion to Reverse or Remand filed by Plaintiff Sandra Vigil.[2] *Doc. 11.* I have carefully considered the entire record and recommend that the motion be granted and the action remanded to the Commissioner for further proceedings.

### I. Factual Background

Sandra Vigil married Enrique Dominguez in August 1978. Approximately three and one-half years later she divorced him by a final decree entered February 23, 1982. *Administrative Record* ("*Record*") at 108. Exactly three hundred days after the divorce became final, Sandra gave birth to Jesus Enrique Dominguez on December 20, 1982. *See id.* at 92, 31.

Plaintiff testified that although Enrique was her husband, the namesake for her child and had supported the child after their divorce, she had never lived with him. Rather, she met

---

[1] On November 9, 2001, Jo Anne B. Barnhart was sworn in as Commissioner of Social Security. In accordance with FED. R. CIV. P. 25(d)(1), Ms. Barnhart is substituted for Larry G. Massanari as the Defendant in this action.

[2] In the Administrative Record, some people are referred to by different last names or different spellings of their last name. For clarity, I use the same names as the Administrative Law Judge ("ALJ") used and refer to people by their first names.



Manuel Fabela at a bar in 1977, dated him for four years, and then lived with him for two years. In other words, Sandra first dated Manuel but thereafter married Enrique, yet continued her relationship with Manuel throughout the duration of her marriage. *See id.* at 43-45, 52-53.

Plaintiff and Enrique tried unsuccessfully to conceive while they were married. Plaintiff explained that throughout the marriage, she sent money to his other children in Mexico. According to Sandra, Enrique supported her son because he felt indebted to her for this kindness. *Id.* at 53-54. Plaintiff further testified that Jesus is Manuel's son and that she became pregnant when he insisted she remove her IUD so that he could have a child. She told others Manuel was Jesus' father, but never sought to establish Manuel's paternity. *Id.* at 43.

Manuel neither married Sandra nor supported Jesus. Instead, he married Lucy Fabela, who gave birth to his son[3] in March 1983, two and one-half months after Jesus was born. Evidently, Manuel was seeing Sandra and Lucy at the same time. *See id.* at 45, 47–49.

After Manuel died in January 1996, Plaintiff filed an application for child insurance benefits on behalf of Jesus on March 5, 1996. The application claimed Jesus was living with Manuel at the time of his death, which all agree was inaccurate. *See id* at 92-97, 174.[4] To support her contention that Manuel fathered Jesus, Sandra submitted a signed and witnessed New Mexico paternity statement form. The State issued these forms in 1994. Manuel purportedly signed the 1994 form on January 5, 19<u>8</u>3. Sylvia Campos is the notary who witnessed Manuel's signature. *See id.* at 99, 126.

Sandra had used the 1994 paternity form to secure a new birth certificate for Jesus to

---

[3] This child is also named Manuel Fabela.

[4] The application documents note that if applicants make false statements or representations in an application, they can be prosecuted criminally.

2

show his last name as Fabela and his father as Manuel and to secure Jesus a social security card with his last name as Fabela. Sandra secured the amended birth certificate and social security card "months" after Manuel's death. *See id.* at 54-55, 98-99, 123, 124, 155, 170.

When the Social Security Administration ("Administration") noticed that Manuel purportedly signed a 1994 form in 1983, it contacted the notary and asked for her "log book," which she was unable to produce. She would later explain that the books were destroyed by water damage. The Administration also contacted the State with its suspicions and later the State revoked the amended birth certificate. *See id.* at 39, 54, 98-99, 101, 104, 121, 123, 170.

In April 1996, the Administration advised Sandra that unless she had documents other than the paternity statement and amended birth certificate, her claim "will have to be denied." This notice stated:

> You must send us the original records. If you don't have the original, you must send a copy certified by the person so is the custodian of the original record. Do not send copies signed by a notary public. We can accept a photocopy of a W-2 form or a tax return.

*Id.* at 99. In response, the notary submitted a written explanation about the date discrepancy in the 1994 paternity form. She claimed that in 1983 Sandra and Manuel asked her to witness an undated typewritten document where Manuel acknowledged paternity of Jesus. She also informed the Administration that Sandra had found a copy of the 1983 acknowledgment. *See id.* at 101-04, 115. I reproduce the acknowledgment document below in a similar font, and with identical spacing and spelling:

```
MANUEL FAVELA
GENERAL DELIVERY
SANTA FE, NEW MEXICO   87501
```

```
TO WHOM IT MAY CONCERN:

I MANUEL FAVELA AM THE FATHER OF MY SON ENRIQUE J. DOMINGUEZ, WHO
WAS BORN AT ST. VINCENT HOSPITAL ON DECEMBER 20, 1982.
THE MOTHER OF MY CHILD IS SANDRA VIGIL.
WE WERE MARRIED IN MEXICO IN MARCH 1982, AND AFTER A VERY SHORT
PERIOD OF ONLY THREE MONTHS THE MARRAGE WAS ANNULLED BY SANDRA
VIGIL.

_/s/_____
MANUEL FAVELA



__/s/_____      ___March 23, 1986_____
   NOTARY                                      EXP. DATE
```
*Id.* at 114.

The notary further explained that later, in 1994[5], she was requested to notarize the state-issued paternity form. Although the notary attempted to explain that the 1990 paternity form should reflect the actual signature date, Manuel insisted that she back date it to 1983 since that was the date he signed the 1983 acknowledgment. *Id.* at 115.

## II. ALJ Findings

It is not clear whether the Administration had a copy of the 1983 acknowledgment when it denied benefits on May 28, 1996. *Id.* at 105. In July, Sandra requested reconsideration. In addition to the 1983 acknowledgment, at this time she also tendered statements of neighbors and friends that Manuel was Jesus' father. *See id.* at 111-18. The Administration denied her request for reconsideration on April 2, 1997. *Id.* at 130. She then requested a hearing.

### A. *First Decision After Hearing Before ALJ Silva*

Administrative Law Judge Marion T. Silva conducted a hearing in 1998 where Sandra

---

[5] She testified that a 19<u>8</u>4 reference in her letter to the Administration is a typographical error and what she meant to type was 1994. *Id.* at 40.

4

was represented by counsel. Her opinion denying benefits considers various alternatives under which Jesus could be entitled to benefits, including whether the 1983 acknowledgment and paternity form are sufficient written evidence to establish paternity under 42 U.S.C. § 416(h)(3)(C)(i)(I).

Sandra's counsel argued that even if the 1994 paternity form is entirely ignored, the 1983 acknowledgment coupled with other extrinsic evidence of paternity would suffice. The extrinsic evidence consisted of, for example, statements and testimony by friends, neighbors, and relatives, and a picture of Jesus and Manuel's son by Lucy showing a resemblance to one another. *See id.* at 62, 172. ALJ Silva disagreed, however, that the extrinsic evidence could be considered to establish paternity.

Her detailed opinion opines that where the content of a writing expresses an unambiguous acknowledgment of paternity, she could not consider extrinsic evidence of paternity. Likewise, if the authenticity of the writing was in question, she could not consider extrinsic evidence as a substitute to establish paternity. *Id.* at 173-74.

For ALJ Silva, the issue was whether Manuel signed the 1983 acknowledgment and the 1994 paternity form. She did not expressly conclude that the 1983 document was a forgery. Rather, she concluded that the "circumstances of the execution" of the 1983 acknowledgment and 1994 paternity form was "so irregular that it served to cast doubt" as to their authenticity. *Id.* at 173. She thus decided that Sandra failed to "sustain[] her burden" to show that the two documents "represent authentic statements of the deceased wage-earner, Manuel." *Id.* at 173-74.

Alternatively, ALJ Silva found that the extrinsic evidence of paternity contradictory. On balance she found three facts outweighed other contradictory evidence that Manuel was Jesus'

5

father: Sandra gave birth to Jesus within the period after divorce where New Mexico presumes the former husband to be the father; Sandra gave the baby her former husband's name; and Enrique supported the child upon its birth. *Id.* at 174. Thus, ALJ Silva also decided that the extrinsic evidence neither explained the irregularities in the documents nor was sufficient to establish paternity independent of the writings. *Id.* at 175.

### B. Handwriting Expert Opinion Secures A Second Hearing

Plaintiff requested review of ALJ Silva's decision and an extension of time to submit additional evidence. *Id.* at 181. Plaintiff then tendered the opinion of a handwriting expert, who concluded that the signatures on the 1994 paternity form and the 1983 acknowledgment were Manuel's. *Id.* at 183, 189-90, 193-99. Among other things, counsel argued that "the dispositive issue in this case is whether the statements of paternity" were signed by Manuel and Plaintiff relied on the expert's opinion finding the signatures genuine as entitling Jesus to benefits under 42 U.S.C. § 416(h)(3)(C)(i)(I).

The argument secured a remand from the Appeals Council. *Id.* at 203-4. It noted that **if the expert's "opinion is accepted as valid, then the wage earner did acknowledge in writing his paternity of Jesus."** *Id.* at 204 (emphasis added). Thus, the Appeals Council implicitly found the acknowledgment of paternity to be unambiguous. It directed the ALJ to hold a supplemental hearing on the issue of paternity to "give all parties an opportunity to appear and to submit whatever contentions and/or evidence they wish to submit on the issue of paternity of Jesus." *Id.* at 204.

### C. Second Decision After Hearing Before ALJ Vanderhoof

A different ALJ, Gary L. Vanderhoof, held the second hearing after remand. *Id.* at 14-18.

6

Manuel's widow Lucy equivocated whether the signatures on the 1983 acknowledgment and 1994 paternity form looked like those of her husband. She first testified that "it sort of looks like it" and stated to the ALJ that she had "papers at, at home that you could really match with it." *Record* at 73. After the ALJ explained that he was not qualified to serve as a handwriting expert, Lucy testified "No, that's not his signature," *id.* at 74. Her final comment on the subject was that the signature did look like her husband's "in a way, except right here, no, it doesn't because I have his signature at home." *Id.* at 76.[6]

The handwriting expert had informed Plaintiff's counsel that she charges $500 a day for court testimony and $75 for exhibits. *Id.* at 184. Aware of the cost of the expert's in-court services, ALJ Vanderhoof did not call her to testify, saying "I have no question as to possibly [sic] the validity of the signatures," *id.* at 79, and "although he – the signature might – there's no question with the handwriting expert to purport to be his," *id.* at 80.

In his written opinion, ALJ Vanderhoof did not expressly decide whether the signatures were genuine. Rather, he considered the expert's opinion irrelevant -- of "no consequence." *Id.* at 16. Incorporating ALJ Silva's previous "detailed discussion . . . concerning the irregularities" by reference, ALJ Vanderhoof found that the documents tendered to satisfy this provision were "so irregular" that their authenticity "is highly questionable" and accorded them no weight. *Id.* Thus, he concluded, "the statement by the handwriting expert that the signatures on the documents are authentic does nothing to establish the authenticity of the documents in question." *Id.* He denied benefits.

Plaintiff appealed. Among other things, counsel argued that Lucy testified one of the

---

[6] The context of this testimony appears to be the widow's and I note that the person who transcribed the hearing appears to have incorrectly designated which witness was speaking.

7

signatures "appeared to be that of her husband" and ALJ Vanderhof said that he had no doubt that the signatures on the documents were those of Manuel even though he had concerns over the circumstances of their execution. *Id.* at 220. The Appeals Council affirmed saying that it audited the hearing tape and did not find "such unequivocal statements or testimony" by ALJ Vanderhoof or Lucy. *Id.* at 6. It did not address Plaintiff's other arguments. This suit followed.

### III. Analysis

Plaintiff argues that ALJ Vanderhoof: (1) failed to fully develop the record by neglecting to call the expert to testify; (2) failed to consider the extrinsic evidence of Manuel's paternity, which tend to show it is likely that he did sign the writings despite their irregularities; and (3) did not support his decision with substantial evidence, particularly with respect to the authenticity of the 1983 acknowledgment. Defendant acknowledges that ALJ Vanderhoof "did not deny that the signatures on the two [documents were Manuel's]," *Doc. 13* at 14, focuses on defining Plaintiff's burden, and argues the issue is one of credibility and weight based on all of the evidence.

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-1500 (10th Cir. 1992). After first clarifying the nature of Plaintiff's burden, I conclude this matter must be remanded because I find the ALJ did not apply the correct legal standards and consequently failed to develop the record. Therefore, although I have reviewed the entire record and discuss the evidence, I need not decide at this juncture whether the ALJ's decision is supported by substantial evidence.[7]

---

[7] In reviewing whether the ALJ's decision is supported by substantial evidence, my assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as

8

## A. Plaintiff's Burden Is Preponderance

As Defendant observes, in "child benefit cases, the claimant bears the burden of proving entitlement as the child of a deceased insured wage earner," *Younger v. Shalala*, 30 F.3d 1265, 1267 (10th Cir. 1994), and the regulations generally require that evidence be "convincing," 20 C.F.R. § 404.708. Defendant's arguments and citations suggest that because evidence must be "convincing," Plaintiff bears a heavier burden. However, one recent child benefits decision describes the claimant's burden as "preponderance of the evidence." *Low Dog. v. Barnhart*, 196 F. Supp. 2d 960, ___, 2002 WL 598208 (S.D. 4/5/02). *Low Dog* cites a recent unpublished Tenth Circuit decision that reaches the same conclusion:

> We begin by agreeing with Young that a claimant's burden is the preponderance-of-the-evidence standard, though somewhat surprisingly, we cannot cite Supreme Court or Tenth Circuit authority on point. . . . Though the Social Security Act does not specify the appropriate standard, **we agree with the Seventh Circuit's conclusion that there is "no doubt that the preponderance of the evidence is the proper standard, as it is the default standard in civil and administrative proceedings."**

*Young v. Apfel*, 198 F.3d 260 (10th Cir. 1999), quoting *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (other citations omitted). Thus, I reject the suggestion that Plaintiff's burden is something more than a preponderance of the evidence.

Plaintiff asserts that she need not prove Jesus is Manuel's biological son, and Defendant takes no issue with the assertion. A decision from another court in this circuit noted there are divergent views whether claimants must tender some other proof of a biological relationship

---

adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

9

before they can use the § 416(h)(3)(C)(i)(I) writing alternative as a basis for benefits. That decision follows the position that a claimant need not prove a biological relationship. *Mack on Behalf of Wesley v. Sullivan,* 813 F. Supp. 760 (D. Kan. 1993). I am persuaded this is the correct view in part because in broadening the Social Security Act, Congress was making it easier for children to recover benefits. *E.g.,* Kelly Wall Schemenauer, *Comment, Adams v. Weinberger and Dubinski v. Bowen: Posthumous Illegitimate Children and the Social Security Child Survivorship Provision,* 73 Iowa L.Rev. 1213, 1215-16 (1988) (for example, children who are labeled "illegitimate" may recover benefits).

Finally, the terms of the Appeals Council remand indicated that the writing alone would suffice if the signatures are found genuine. The Appeals Counsel expressly noted that "if Ms. Housley's opinion is accepted as valid, then the wage earner did acknowledge in writing the paternity of Jesus E. Dominguez." *Record* at 203-04.

### B. *Findings Erroneously Assigned Burden To Plaintiff*

Having reviewed the record in detail, I think it is plain that both of the ALJ opinions assume the signatures on the 1983 acknowledgment and 1994 paternity form are Manuel's, but keeping the burden on Plaintiff, reject the documents as inauthentic. In other words, even though they did not say so, it is evident that both ALJs believed even if the signatures *look* like Manuel's, Sandra and the notary concocted the two documents to obtain benefits for Jesus. That conclusion could potentially carry serious consequences such as criminal penalties. Moreover, keeping the burden on Plaintiff is an incorrect application of legal standards.

The well established obligation of the ALJ to develop the record is "equally applicable in a child benefit case." *Younger,* 30 F.3d at 1268. Children of "insured" decedents are entitled to

benefits if the child (1) applies for benefits, (2) is under eighteen years old, (3) is unmarried, and (4) was "dependent" on the insured at the time of the insured's death. *See* 42 U.S.C. § 402(d)(1); *Record* at 14, 160. There was no dispute that Jesus met the first three criteria.

The Act defines a number of alternative ways to establish dependency, and the only one at issue is the ALJ's decision concerning 42 U.S.C. § 416(h)(3)(C)(i)(I). *See Doc. 12* at 7. Under that section of the statute, the child is entitled to benefits if the decedent "has acknowledged in writing that the applicant is his or her son or daughter." Similarly, the applicable regulation provides:

> *Eligibility as a natural child.* You may be eligible for benefits as the insured's natural child if any of the following conditions is met:
>
> \* \* \* \* \*
>
> (3) You are the insured's natural child and your mother or father has not married the insured, but the insured has . . . acknowledged in writing that you are his or her child . . . . If the insured is deceased, the acknowledgment . . . must have been made or issued before his or her death.

20 C.F.R. § 404.355(a)(3).

There are no formal requirements for the written acknowledgment alternative. It is sufficient if (1) a written document, (2) made by the decedent or at his direction before death, (3) acknowledges paternity. Indeed, to qualify the document need not be notarized nor filed with any entity. No signature is required although a signed acknowledgment is considered highly probative.[8] Unless "it can be proven to be something other than the wage earner's written

---

[8] *See also SocSec Ruling 79-22*, 1979 WL 155336 at \*1 ("The fact that [a Veteran's administration application] was never filed or the fact that it was never sworn to before a notary public is of no consequence."); *id.* at \*2 ("neither the Act nor the Regulations . . . requires that the acknowledgment be executed in any special way. Any statement written by the wage earner, or at his direction, which acknowledges . . . the claimant as the wage earner's son or daughter is sufficient

11

acknowledgment" (in other words, "[s]hort of proof of forgery"), documents that meet the above criteria "meet the requirements of the Act." *SocSec Ruling 79-22*, 1979 WL 155336 at *1, 2.

Documents that meet the above criteria are characterized as creating a presumption of paternity, including the decision from this circuit which I found persuasive above. *See Mack*, 813 F. Supp. at 764 ("If a written acknowledgment of paternity exists, the claimant is statutorily presumed eligible for benefits. *Jones v. Sullivan*, 953 F.2d 1291, 1294 (11th Cir. 1992)."). The Social Security Ruling above that notes a forged or inauthentic document will not suffice does not mention who bears the burden of demonstrating the fraud. A recent decision indicates that the Commissioner's own Programs Operation Manual provides that in light of documents that give rise to the presumption, the Commission has the burden to rebut the presumption. *Low Dog*, 196 F. Supp.2d at ___, 2002 WL 598208.

On the other hand, the *Low Dog* decision relates that, contrary to my finding above, the Manual places the burden on Plaintiff to submit "clear and convincing" evidence. *Id.* My research indicates that the "clear and convincing" language derives from an early regulation where there was the writing was **unsigned**. *See SocSec Ruling 72-32*, 1972 WL 12320 at *1. Thus, if the Manual takes the position that the evidence need be clear and convincing in all cases, it contradicts the 1972 ruling.

As I read these authorities, if there is proof by a preponderance of the evidence that Manuel did sign the documents, then Plaintiff is entitled to a presumption and the burden shifts

---

acknowledgment in writing to satisfy the statutory requirement."); *SocSec Ruling 72-32*, 1972 WL 12320 at *1 ("From a literal reading of the Act, it is not evident that the statute requires, as a matter of law, that a writing by the insured worker acknowledging a child to be his son or daughter, be attested to by his signature in every case. What is required. . . is that the insured worker have 'acknowledged in writing that the applicant is his son or daughter.' Such a writing, when attested to by the signature of the worker, would ordinarily be of higher probative value with respect to its authorship than one which is not.").

to the Commissioner to show fraud. The opinion of the handwriting expert is therefore highly relevant and as crucial as the Appeals Council indicated. Yet, ALJ Vanderhoof dismissed the expert's opinion as essentially irrelevant, despite a remand that characterized the issue as dispositive of whether § 416(h)(3)(C)(i)(I) is met, and despite the fact that her testimony might have had bearing on the fraud issue as well. Moreover, neither of the ALJ opinions identified what burden they initially assigned Plaintiff, the fact that a presumption arises for documents that meet the minimum requirements, when the burden would shift to the Commissioner, or whether they in fact shifted the burden to the Commissioner. There is no basis for me to conclude that the omission of the correct legal standards is merely a deficiency in opinion writing technique.

In addition, the ALJ opinions assign the presumption in favor of Enrique based New Mexico's 300-day law. However, the *Jones* decision, cited by ALJ Silva, holds that a district court "strayed in emphasizing the Georgia presumption of legitimacy, a state presumption not applicable in a federal cause of action such as we have here" under § 416(h)(3)(C)(i)(I). *Jones*, 953 F.2d at 1294.[9]

The ALJ opinions ultimately focus on the extrinsic evidence. I recognize that extrinsic evidence of paternity can be used "where there are doubts about the veracity . . . of the written acknowledgment." *Jones*, 953 F.2d at 1295. Here, both ALJs found the extrinsic evidence supported finding Enrique as the father and against finding that Manuel signed the documents. I further recognize that the circumstances surrounding the documents are highly suspicious and that the extrinsic evidence of paternity cuts both ways. Nevertheless, "[f]ailure to apply the

---

[9] Even if *Jones* is incorrect, if the signatures here are genuine then both presumptions come into play: Jesus is presumed Enrique's son under New Mexico law and presumed Manuel's son under the written acknowledgment alternative. The Administration is the entity that should reconcile the divergent results in the first instance.

13

correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation omitted). In light of the above discussion, I cannot conclude that the proper legal principles were applied, even though the outcome may ultimately be the same.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Plaintiff's motion be granted and this action remanded to the Commissioner for further proceedings.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE